```
LODGED
CLERK, U.S. DISTRICT COURT
8/20/25
CENTRAL DISTRICT OF CALIFORNIA
BY:     MRV     DEPUTY
```

# United States District Court

**CENTRAL** **DISTRICT OF** **CALIFORNIA**

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

Up to $842,490.00 on deposit in East West Bank account 8133082670 and up to $1,204,000.00 on deposit in East West Bank account 8133086226

**APPLICATION AND AFFIDAVIT FOR SEIZURE WARRANT**

**CASE NUMBER:** 2:25-MJ-05090

```
FILED
CLERK, U.S. DISTRICT COURT
Aug. 20, 2025
CENTRAL DISTRICT OF CALIFORNIA
BY:     ch     DEPUTY
```

I, Fred D. Apodaca, being duly sworn depose and say:

I am a Special Agent with the United States Secret Service, and have reason to believe that

in the __**CENTRAL**__ District of __**CALIFORNIA**__
there is now concealed a certain person or property, namely (describe the person or property to be seized)

Up to $842,490.00 on deposit in East West Bank account 8133082670 and up to $1,204,000.00 on deposit in East West Bank account 8133086226

**which is** (state one or more bases for seizure under United States Code)

**subject to seizure and forfeiture under** 18 U.S.C. §§ 981(a)(1)(C) and (b)(2); 982(b); 984; 21 U.S.C. § 853(f)

concerning a violation of Title _18_ United States Code, Section(s) _1343_.

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

Continued on the attached sheet and made a part hereof.     X Yes __ No

/s/ S.A. Fred D. Apodaca
Attested to by the applicant in accordance with the
Requirements of Fed. R. Crim. P. 4.1 by telephone

Sworn before me in accordance with requirements of
Fed. R. Crim. P. 4.1 by telephone

August 20, 2025
**Date**

Los Angeles, California
**City and State**

Hon. Brianna Fuller Mircheff, U.S. Magistrate Judge
**Name and Title of Judicial Officer**

*[signature]*
**Signature of Judicial Officer**

AUSA Ryan Waters: jw

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT**

I, Fred D. Apodaca, being duly sworn, hereby depose and state as follows:

**I.**

**INTRODUCTION**

1.  I am a Special Agent with the United States Secret Service ("USSS") assigned to the Los Angeles Field Office Cyber Fraud Task Force.  I have been employed by the USSS since December 2008.  In this capacity, I am responsible for investigating violations of federal criminal law, particularly those laws found in Title 18 of the United States Code and relating to financial institution fraud, credit card fraud, identity theft, and stolen U.S. Treasury Checks.  I have received formal training at the Federal Law Enforcement Training Center and the USSS James J. Rowley Training Center.  My training includes, but is not limited to, various investigative techniques and tactics regarding financial crimes, including credit card fraud, identity theft, illegal methods used to obtain credit cards, bank loans, and other lines of credit, and methods used to launder and conceal the proceeds. Prior to my employment with the U.S. Secret Service, I was employed for four years as a Financial Analyst with the Federal Bureau of Investigation.

2.      Unless stated otherwise, I have personal knowledge of the matters set out in this affidavit.  To the extent that any information in this affidavit is not within my personal knowledge, it was made known to me through reliable law enforcement sources, and I believe it to be true.

3.      The facts set forth in this affidavit are based upon my own personal observations, my training and experience, and information obtained during this investigation from other sources, including: (a) statements made or reported, directly or indirectly, by various witnesses with personal knowledge of relevant facts, including other law enforcement officers; (b) records obtained during the course of this investigation; and (c) interviews conducted by other USSS special agents.

4.      This affidavit is intended to show that there is sufficient probable cause for the requested seizure warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  All figures, times, and calculations set forth herein are approximate.

## II.

## **PURPOSE OF AFFIDAVIT**

5. This affidavit is offered in support of an application for warrants to seize:

    a. Up to $673,000.00 (the "Subject Funds 1") on deposit in Cathay Bank account 0100993664 ("Subject Account 1"), held in the name of Great Lands of America LLC;

    b. Up to $1,204,000.00 (the "Subject Funds 2") on deposit in East West Bank account 8133086226 ("Subject Account 2"), held in the name of Ruizhi Zhang;

    c. Up to $842,490.00 (the "Subject Funds 3") on deposit in East West Bank account 8133082670 ("Subject Account 3"), held in the name of Nanxi Zhong; and

    d. Up to $533,000.00 (the "Subject Funds 4" and, together with Subject Funds 1 and 2, and 3 collectively referred to herein as the "Subject Funds") on deposit in JP Morgan Chase Bank account 695658313 ("Subject Account 4" and, together with Subject Accounts 1 and 2, and 3, collectively referred to herein as the "Subject Accounts"), held in the name of TCHN Engineering Inc.

6. Based on the facts set forth below, there is probable cause to believe that the Subject Funds represent proceeds or are involved in violations of 18 U.S.C. § 1343 (Wire Fraud), which constitutes "specified unlawful activity" pursuant to 18

U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B). Specifically, there is probable cause to believe that the Subject Funds are proceeds of confidence frauds[1] and social engineering scams[2], perpetrated against numerous victims.  Therefore, the Subject Funds are subject to seizure pursuant to 18 U.S.C. § 981(b)(2) and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(c).

  7. In addition, there is probable cause to believe that the Subject Funds are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 982(b) and 21 U.S.C. § 853(f) because the funds would, in the event of conviction on the alleged underlying offenses, be subject to forfeiture, and an order under section 21 U.S.C. § 853(e) would not be sufficient to assure the availability of the property for forfeiture.

  8. To the extent that the Subject Funds are not the actual monies traceable to or involved in the illegal activities

---

[1] According to Blackstone's Criminal Practice, confidence frauds involve a victim transferring money and/or property as a result of being deceived or misled by the offender.

[2] Social engineering is a method used to manipulate victims into performing certain actions or providing confidential information. When successfully executed, social engineering techniques can cause a victim to send money to someone whom he or she met on a dating website or to provide confidential information such as his or her personal identifiable information and bank account information.  Additionally, victims sometimes serve as money mules, individuals recruited to receive and transfer money acquired from criminal activities on behalf of criminals and money launderers.

identified herein, the government alleges that these funds are identical property found in the same account as the property traceable to or involved in the illegal activities, rendering these funds subject to forfeiture pursuant to 18 U.S.C. § 984 (forfeiture of fungible property).

### III.

### SUMMARY OF PROBABLE CAUSE

9.   The USSS has interviewed multiple victims of confidence frauds who transferred funds based on fraudulent pretenses directly into Subject Accounts 1 and 4, and to a CTBC Bank account ending in 3108 (the "X3108 Account"). These accounts were first identified as suspicious in May 2025, after a Cathay Bank investigator flagged suspicious activity in the accounts, with multiple large deposits within a short time and attempted same day or next day withdrawals. Given the suspicious activity on the account, Cathay Bank contacted USSS for further investigation, which revealed that funds from the X3108 Account were ultimately transferred to Subject Account 3 and to an East West Bank account ending in X5053 (the "X5053 Account") from which funds were transferred to Subject Account 2.

## IV.

## **STATEMENT OF PROBABLE CAUSE**

<u>HISTORY OF SUBJECT ACCOUNTS</u>

10. On or about May 28, 2025, Subject Account 1 was opened in the name of Great Lands of America LLC, with an identified address in Irvine, CA, and Xi Dai ("Dai") identified as the only authorized signer. According to California Secretary of State records, Great Lands of America LLC is a California Corporation registered in 2024 with a principal address in Newport Beach, CA. Dai, the Subject Account 1 and X3108 authorized signer, is listed as the Registered Agent.

11. On or about June 30, 2025, Subject Account 2 was opened in the name of Ruizhi Zhang ("Zhang"), with an identified address in Irvine, CA 91007, and Zhang identified as the only authorized signer.

12. On or about February 23, 2024, Subject Account 3 was opened in the name of Nanxi Zhong ("Zhong"), with an identified address in Irvine, CA and Zhong identified as the only authorized signer.

13. On or about January 27, 2025, Subject Account 4 was opened in the name of TCHN Engineer Inc., with an identified address in Los Angeles, CA, and Tony Chen ("Chen") identified as the only authorized signer. According to California Secretary of State records, TCHN Engineer Inc. is a California Corporation

6

registered in January 2025 with a principal address in Sacramento, CA and 1505 Corporation Northwest listed as the Registered Agent.

14. The X3108 Account, like Subject Account 1, was held in the name of Great Lands of America LLC and maintained at CTBC Bank, with the same authorized signer, Dai, as Subject Account 1. Funds from the X3108 account ultimately were transferred to the X5053 Account and to Subject Account 3.

15. The X5053 Account, like Subject Account 2, was held in the name of Ruizhi Zhang at East West Bank and has the same authorized signer as Subject Account 2. Funds from the X5053 Account were ultimately transferred to Subject Account 2.

CONFIDENCE AND ROMANCE SCAM VICTIMS

16. As described in further detail below, fraud victims interviewed by the USSS have related similar stories about having been lured into online communication regarding crypto currency investment with people whom they had never met in person. The victims were then induced to transfer funds to a bank account for the purpose of investing in crypto currency, except the account is controlled by criminals.

17. **Victim V.W.:** In July 2025, I spoke to V.W. of La Habra, CA regarding a $400,000.00 wire transfer sent on June 11, 2025, to Subject Account 1; a $847,000.00 wire transfer and $1,258,000.00 wire transfer sent on May 8, 2025, and May

7

23,2025, to the X3108 Account; and a $533,000.00 wire transfer sent on February 13, 2025, to Subject Account 4.

18. On December 25, 2024, V.W. received an unsolicited message on the online app Next Door. The individual identified herself as Amy Huang ("Huang") and told V.W. she contacted him because she saw on his profile he was from California and wanted information on the state in the event she decides to move to California. Huang told V.W. she was originally from China and now lived in Long Island, NY. From December 2024 to June 2025, V.W. and Huang communicated via WhatsApp and V.W. considered the relationship to be a friendship; their communications were often about their families and careers. Huang told V.W. her residence address is 15 Hudson Yards, apartment #6805, New York, New York 10001. V.W. now feels that was a fake address, because he once sent a card to this location, and it was returned to him as undeliverable.

19. In February 2025, Huang told V.W. she worked for company owned by her aunt. The company purportedly employed approximately eighty people and specialized in analyzing investment trends in stocks, bonds and cryptocurrency. During one conversation, Huang asked V.W. if he invested in cryptocurrency and told him she could provide trading advice so he could earn greater than 20% returns using short term trading strategies. At first, V.W. was hesitant to invest but was

8

convinced by Huang that it would earn him better returns than traditional stocks.

20. V.W. was instructed by Huang to open an account at Coinbase.com, and purchase the cryptocurrency called Tether. Huang then advised V.W. to open an account at Btchkle.com and transfer the Tether from Coinbase.com to an account wallet at Btchkle.com. V.W. first investment was for $10,000.00 and he was instructed by Huang what trades to make. The first trade netted V.W. a purported 20% return. Now feeling confident in the process, V.W. made a second investment of $100,000.00. Using the same process as before, he sent funds to his Coinbase.com account for the purchased of Tether, which was then transferred to the Btchkle.com wallet. After the $100,000.00 investment, V.W.'s account balance had earned a purported $20,000.00 profit.

21. Huang told V.W. that he could earn double the investment returns if he invested a minimum of $5 million. To come up with the funds, Huang said she would invest her own funds and funds from some of her friends, for a total purported investment of $1.7 million. To come up with the remaining funds, V.W. sent the following: On February 13, 2025, $533,000.00 wire transfer to Subject Account 4; On May 8, 2025, $847,000.00 wire transfer to the X3108 Account; and from April 2, 2025, to April 22, 2025, sent wire transfers totaling approximately $1.9

9

million to a bank account at Cross Rivers Bank, account name Fortress Trust LLC.

22. V.W. received the bank account and routing information via a chat message application with customer service on the Bakht.com website. A few weeks after making his final investment, V.W. checked his account balance which showed a purported balance of over $16 million. With such a large investment return, V.W. decided to then withdraw the funds from his account on the bakcht.com website. V.W. was told by a customer service representative that his account was "flagged" for suspicious insider trading and possible money laundering activity. To unfreeze his account V.W. was told he must pay a 10% risk deposit fee, which would require payment of $1,658,000.00. V.W. did pay the $1,658,000.00 fee by wire transferring $1,258,000.00 on May 23, 2025, to the X308 Account and $400,000.00 on June 11, 2025, to Subject Account 1; V.W. was then advised his account was now unfrozen. To withdraw funds, V.W. provided a customer service representative on the Bcht.com his Coinbae.com wallet address of where to transfer the balance of his account in cryptocurrency. After a few days, V.W had not received the transfer to his Coinbase.com account and contacted a customer service on Bcht.com website, where he was told that he provided them an incorrect cryptocurrency wallet address and his funds were sent to that address and could not be returned. A

10

few days later V.W. received correspondence from a Bcht.com representative who told him they could help recover the transfer that was sent to the incorrect wallet address, but that he must pay a 10% fee of approximately $1.8 million.

23. At this point V. W. realized he was a victim of fraud and would not get his funds returned. On June 26, 2025, V.W. filed a complaint report on FBI IC3.gov and a report with ReportFraud.ftc.gov.

24. Based on my training and experience, I believe V.W. is a victim of a romance and confidence scam and the $400,000.00 wire transfer sent on June 11, 2025, to Subject Account 1; the $847,000.00 wire transfer and $1,258,000.00 wire transfer sent on May 8, 2025 and May 23,2205, to the X3108 Account; and the $533,000.00 wire transfer sent on February 13, 2025, to Subject Account 4, represented fraudulent proceeds of such a scam.

25. **Victim J.F.:** In July 2025, I spoke to J.F. of Ogden, UT regarding a June 18, 2025, $642,000.00 wire transfer to Subject Account 1. In May 2025, J.F. wanted to invest in crypto currency and looked online for a cryptocurrency trading platform. After looking at a few trading sites, J.F. decided to use a platform called bidpanda.com, and downloaded the app. To trade, J.F. received trading instructions from a customer service representative on the bidpanda.com website who would advise him when to buy and sell cryptocurrency; J.F. was told

11

his trades would always be selling at the high price and buying back at a lower price.

26. The first investment J.F. made was for $480,000.00. J.F. sent the wire transfer to the bank account of Coinbase.com, account number ending in 9867 at Cross Riverbank. J.F. opened an account on Coinbase and would then buy the cryptocurrency Ethereum and converted it to cryptocurrency called Tether. J.F. said it was converted because bidpanda.com only accepted Tether on their trading platform. A few weeks after making his investment and engaging in a few trades, J.F. was surprised to learn his bitpanda.com account balance was now purportedly worth $1.4 million.

27. Then aware that he purportedly made approximately $1 million in profit from his initial $480,000.00 investment, J.F. attempted to withdraw $700,000.00 of his funds but was told by a bidpanda.com representative that a $642,000.00 payment was required to pay for the tax on his profits. J.F. did ask if the funds could be taken out of his account balance of $1.5 million. He was told that new funds were required, and on June 18, 2025, he sent a $642,000.00 wire transfer to Subject Account 1. To funds this transfer, J.F. took funds out of his retirement account. A few days after sending the $642,000.00 wire, J.F. once again tried to withdraw $700,000.00 from his account; however, this time he was told he must pay a 20% profit fee.

J.F. did once again ask for the fee to be taken out of his balance, but again was told he must send new money. It was at this point J.F. realized he would not get his funds returned and was a victim of fraud.

    28.  A few weeks after realizing he was a victim of fraud, J.F. was contacted by a recovery specialist named Oliver that advised him they could help get his funds returned. Oliver claimed to specialize in loss recovery of crypto currency investments. J.F. decided to hire Oliver and about a week later Oliver told J.F. that he hacked into his bitpanda.com account and located $1.4 million of his crypto currency. Oliver further told him that a $30,000.00 fee payment was needed prior to the recovery of his funds. J.F. agreed and transferred $30,000.00 in cryptocurrency to a bitcoin wallet address provided by Oliver. A few days later, Oliver contacted J.F. and told him that bidpanda.com had seven layers of encryption security and he was only able to hack through four of the layers.  Oliver then requested another $30,000.00 payment, which Oliver said would be used to buy a special hacking software to bypass the remaining three layers of security. Now out of funds, J.F. was unable to send additional funds and was suspicious that Oliver was also scamming him out of his funds; and that Oliver was most likely working with the same individuals from the bidpanda.com scam.

29. Based on my training and experience, I believe J.F. is a victim of a romance and confidence scam and the $642,000.00 wire transferred to Subject Account 1, on June 18, 2025, represents fraudulent proceeds of such a scam.

TRACING FRAUD PROCEEDS INTO THE SUBJECT ACCOUNTS

30. From my review of the Subject Account 1, Subject Account 4 and the X3108 Account bank records, the following fraudulent proceeds described above were directly deposited into Subject Account 1, Subject Account 4 and the X3108 Account:

   a. On June 18, 2025, a $642,000.00 wire transfer to Subject Account 1, from victim J.F.;

   b. On June 11, 2025, a $400,000.00 wire transfer to Subject Account 1, from victim V.W.;

   c. On May 23, 2025, a $1,258,000.00 wire transfer to the X3108 Account, from victim V.W;

   d. On May 08, 2025, a $847,000.00 wire transfer to the X3108 Account, from victim V.W;

   e. On February 13, 2025, a $533,000.00 wire transfer to Subject Account 4, from victim V.W.

31. In addition, from my review of bank records, I learned victim funds were transferred from the X3108 Account to the X5053 Account and Subject Account 3; victim funds were transferred from Subject Account 1 to the X5053 Account; and

victim funds were transferred from the X5053 Account to Subject Account 2 as follows:

    a. On May 12, 2025, a $842,490.00 cashier's check drawn on X3108 Account was deposited into Subject Account 3.

    b. On May 28, 2025, a $835,000.00 wire transfer was sent from the X3108 to the X5053 Account.

    c. On June 16, 2025, a $369,000.00 wire transfer was sent from Subject Account 1 to the X5053 Account.

    d. On July 1, 2025, a $838,896.00 wire transfer was sent from the X5053 Account to Subject Account 2.

    e. On July 8, 2025, a $1,008,000.00 wire transfer was sent from X5053 Account to Subject Account 2.

<u>SUBJECT ACCOUNT 1</u>

32. As described in paragraph sections 30a and 30b, approximately $1,042,000.00 was sent by identified victims to Subject Account 1. As described in paragraph section 31c, $369,000.00 was transferred from Subject Account to the X5053 Account. The government is therefore seeking to seize only the remaining tainted amount, $673,000.00, from Subject Account 1.

<u>SUBJECT ACCOUNT 2</u>

33. As described in paragraph sections 31d and 31e, Subject Account 2 received approximately $1,846,896.00 in funds from the X5053 Account. As described above in paragraph sections 31b and 31c, the X5053 Account previously received $1,204,000.00

15

in tainted funds from Subject Account 1 and the X3108 Account together. The government is therefore seeking to seize only $1,204,000.00 in tainted funds from Subject Account 2.

SUBJECT ACCOUNT 3

34. As described in paragraph section 31a, Subject Account 3 received approximately $842,490.00 in tainted funds from the X3108 Account. The government is therefore seeking to seize $842,490.00 in tainted funds from Subject Account 3.

SUBJECT ACCOUNT 4

35. As described in paragraph section 30e, approximately $533,000.00 was sent by an identified victim to Subject Account 4. The government is therefore seeking to seize $533,000.00 in tainted funds from Subject Account 4.

V.

CONCLUSION

36. Based upon the foregoing, there is probable cause to believe that the Subject Funds represent proceeds derived from violations of 18 U.S.C. § 1343 (Wire Fraud), which constitutes "specified unlawful activity" pursuant to 18 U.S.C §§ 1956 (c)(7)(A) and 1961 (1)(B). Therefore, the Subject Funds are subject to seizure under 18 U.S.C § 981(b)(2) and forfeiture pursuant to 18 U.S.C § 981(a)(1)(c).

37. In addition, there is probable cause to believe that the Subject Funds are subject to seizure and forfeiture to the

United States pursuant to 18 U.S.C. § 982(b) and 21 U.S.C. § 853(f) because the funds would, in the event of conviction on the alleged underlying offenses, be subject to forfeiture, and an order under section 21 U.S.C. § 853(e) would not be sufficient to assure the availability of the property for forfeiture.

38.  To the extent that the Subject Funds are not the actual monies traceable to or involved in the illegal activities identified herein, these funds are identical property found in the same account as such property, rendering these funds subject to forfeiture pursuant to 18 U.S.C. § 984.

/s/ Fred Apodaca
Fred Apodaca
Special Agent
United States Secret Service

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  20th  day of August 2025

HONORABLE BRIANNA FULLER MIRCHEFF
UNITED STATES MAGISTRATE JUDGE

17